Sabbe. Sabbe. Okay. Great. Thank you very much. And let me just make sure, uh, Council, uh, opposing Council, can you, could you give me a thumbs up or something that you, that you can hear us? Okay. I can hear you. And terrific. In that case, Council, we're ready to hear your argument when you're ready. May it please the courts. Again, my name is Lauren Oliveros, and I'm here on behalf of my client, April Sabbe, individually on behalf of, uh, her late husband, Rene Sabbe. I would like to reserve three minutes for rebuttal time, please. That's fine. Just keep track of your time, please. Thank you, Your Honor. One hour and 30 minutes, 5,500 seconds. That's the time that the Washington County Sheriff's officers had to investigate the potential crimes, to counsel. I counted on the CAD report. 78 units responded, some of which I assume were, were two person occupants. And we, the sheriff's office had to call out the tactical negotiations team, the consolidated navigation unit, canine units, um, specialized equipment such as the armored vehicle. These things take time in order to set up for what amounts to, in this case, a barricaded man type call. Is it your position that, that because 98 minutes passed, that was more than sufficient time for them to establish a command post and a tactical plan in order to approach him? Because I'm reading the talk about kind of an ebb and flow, that at some points, the events were rapidly evolving, and at other points, there was nothing going on because they weren't sure where he was. How does that all factor into the analysis here? Well, Judge, I think that there was not a rapidly evolving situation, according to the supervisor Bowman, between, I want to say, 2-12, all the way up into when they say they saw Mr. Sabe moving in his vehicle, and that was at... And, and the testimony at that point, when he started, when he went, quote, mobile a little bit after 3 o'clock that afternoon, the testimony was that was a rapidly evolving situation, was it not? And that's the time that I, that I, that I am referencing, that there was... So, so, Judge, Chalman asked a question, and you don't have very much time. So, is it your position that those last, it's about four minutes, that was rapidly evolving? The last few minutes, the last three minutes from the time, the 27, when they said they thought he moving in the car, and then at 329, there was that order to block, I believe... We're looking for a yes or no. Yes. Is that your contention? Yes, it is, Your Honor. At that point in time, I believe it is rapidly... Okay, back up one notch, please, because, you know, you're using your time here, so we're trying to get you to answer these questions, please. If the last few minutes are rapidly evolving, they seem to be triggered by this notion that, according to the CAD, that he went mobile at that point, and you argue pretty strenuously he didn't go mobile, they just saw movement in the truck. That's what you argue in your briefing, right? Could you focus on that point? Is it... I'm trying to figure out what your strongest argument is. Is your contention that things didn't need to escalate at that point because he had only moved in inside the truck? Is it... Could you flesh this out for me, please? Yes, Your Honor. I believe that when the tank went onto the property, that they escalated the situation unnecessarily, and there was ample time before that moment when the tank went on at 329. But did the tank go on the property when he was moving or when he was seen in the truck? That is the question. That is the question I believe was a dispute, because the officers said that they had permission to move onto the property, and this was in their answer as well, before, and they went on the property before Mr. Sabi actually moved in his vehicle, and moving... Okay, so wait a minute. So there's moving... Are we talking about the truck moving? So when you read the CAD report, it sounds like they think they're going mobile, quote-unquote, going mobile, that he's gone mobile, meaning the truck has moved, as opposed to... I thought your position is that he'd only... He, his human body, had only moved inside the truck, not that the truck was moving. My position was, at first, they saw him moving inside the truck, and that the truck, at that point in time, which was 327, and that the truck itself was not moving. And when did they go on the property? And that's what our contention is, is that's when they gave the authority to move onto the property, and that's when they made the high alert. I mean, some of them say that they didn't know he was in the truck until they saw him moving in the truck, right? Yes, that is what, that is what they're saying, and that is why our expert and the district court erred in not acknowledging that there were less intrusive means, and those means were to communicate by... When were there less intrusive means? At what, at 27 minutes after the hour? The entire time that they were there, whether or not they were organized... Wait a minute, up until then, that's what Judge Burr's on point, up until then, it seems to me that the record shows they didn't know where he was, but then they see him moving in the truck at 20 minutes, 27 minutes after the hour, right? Is that, is it, do I have that wrong? Yes, that's correct. They're saying they did, they did, they did not know where he was. However, they did have time, and Officer Jentz was at the command station. He's the reporting officer. The last time Officer Jentz saw him, he was in the front of his vehicle, and that's when the district court erred in not even looking at the fact that he actually was out of his vehicle with both hands in front of him, and the officer wasn't even sure if he had a weapon in his hand. That's now almost an hour and a half earlier. We're talking about the last about four minutes. So if you could go back to Judge Burr's point about, is it your contention that when they saw him move in the truck, at that point they found him, right? They see he's in the truck, and he's moved in the truck. Is it your contention that he used inappropriate force by going mobile then? Yes. Based on the crime, which we have evidence that the district court erred in not considering that Mr. Sabe wasn't, according to the law enforcement there, Braun and Jentz, that he wasn't even in the commission of a crime. They had reasonable suspicion of criminal mischief. Then they came on to the property. Well, they had more than that. They had criminal mischief. They had discharge. There were some of the officers inside the armored vehicles who believed that he'd actually fired at Officer Jentz, and there was evidence that shots had been fired, and Jentz said he saw him with a rifle. So all of that information has to be factored into the qualified immunity analysis, does it not? Absolutely. It does have to be factored into the qualified immunity analysis, and also into the analysis on the Fourth Amendment unlawful entry, which the court did not consider, and they have to look at the exigency at the time of the issue. What do you mean the court did consider the unlawful entry issue, didn't it? I'm sorry, Your Honor. What do you mean by the court did not consider unlawful entry? It did consider it. We believe that the court erred on the unlawful entry analysis because she did not consider the exigency and that there was none at the time of the unlawful entry So when he started heading towards the public roadway, you would not consider that to be exigent circumstances? There is nothing in the record that shows that there was any public nearby. There's nothing in the record that shows that Mr. Sabi was actually exiting to the to the roadway. But there were containment units on the road that were out in the open that did not have the officers had inside the armored vehicles. There was containment efforts on the roadway, but my understanding from Officer Brown is that there was containment down Elworth, which is more towards the west. But what I'm asking you is that the incident commander, Lieutenant Lohmann, and Sergeant Bowman before him both testified that they were concerned that if he got out on the public roadway that not only members of the public, but also officers who were containing or securing those roads would be in danger and they did not want him to get back out on the road. And so when he started heading towards the road, that's when the lieutenant authorized the V-150 to go in and contact him. I believe that there are facts and disputes. Hold on, hold on. Was he heading towards the road? Yeah. Could you back up? We're trying to, it's really important you answer our questions. And Judge Tallman has posited one where he was heading towards the road, the truck was moving towards the road. And you never did answer the question about going mobile once they just see him, you know, moving within the truck. So could you narrow your scope? Now we're down to about one minute. And I'm trying to figure out if your argument is that they went in, that armored vehicles went in too soon, or what is it you're arguing? There's two different places where you, there's trigger points. One is, and I didn't mean that to be a pun, but it is important to know at what point you think the officers were using unreasonable force. Is it because they only saw him move within the vehicle or is it that the truck, that it wasn't reasonable for them to use the force they used once the truck started moving towards the road? What is your argument there? It's our argument that it was, the mode of entry of the tank in coming onto the property was unlawful at the time when they entered, which was 2-27, and that created a response in Mr. Sabi. Okay, that was unreasonable because what was, at 2-27... It was 2-27 or 3-27? I'm sorry, 3-27. That was unreasonable because what? What were the circumstances at that minute? Because at that moment, Mr. Sabi, although he was moving, there's no evidence that he was actually moving to the roadway. He could have been moving... Was the truck moving or was he moving in the truck? At that point in time, at 2-27, he was moving in the truck and then that's when the tank came on the property and then the truck went over. But then to continue, was he ever moving towards the roadway? He was moving, the vehicle was moving after 2-27. And does the record say that it was towards the roadway? The record doesn't say that it was towards the roadway. That's not clear from any video. Well, he originally started heading in the opposite direction toward the top of the field, which was where some of the containment units were located, right? But apparently he saw a marked unit on the road with its emergency lights on and turned around and that's when he headed directly towards the V-150. But do you have the CAD in front of you? Because I'm reading the sequence of events differently than you are. I've got a radio transmission from Deputy Talbot at 15-27-52 that the subject is moving inside the truck. But it's not until 15-29-07, almost two minutes later, that Lieutenant Lottman asks the V-150, can you block it? And at that point at 15-29-14, Officer Winfield inside the V-150 reports that it is now moving into the driveway now. And so this thing really gets down to about two minutes when all this occurs. And your position is that the incident is not tense, uncertain, and rapidly evolving, and that the force they used in that two minute period does not entitle them to qualified immunity. Isn't that what the case turns on? Your Honor, I believe that the case doesn't just turn on those two minutes because there was ample time before that for the law enforcement officers to communicate with Mr. Sabi to give him an opportunity to... But they didn't know where he was. Some of them thought he was in the woods and nobody could see him inside the truck. It wasn't until Officer Talbot saw somebody moving inside the truck that they realized that he was still in the vehicle. At 27 minutes after the hour. Could I just... I think I have a very similar timeline, and for me this is a very important and critical part of the case. It seems to me they saw him moving in the truck at 27 minutes after the hour, and that's when they, what I'll say, found him. They realized he was in the truck. Then the armored vehicles entered the field, then the truck moved, and then we have this discussion we just had about which direction was the truck going. But do you agree that they saw him moving in the truck, then the armored vehicles entered, and then the truck moved in that order? Yes, I believe that Mr. Sabi moved in response to the armored vehicle coming onto his property. Doesn't the record also show, or does the record show, could he have gotten onto the road anyway but through the driveway? There is no evidence in the record that he could have gotten onto any of those roads except through the driveway. Yes, that's correct. And the initial reporting officer that he thought he had seen, Mr. Sabi, standing outside his truck at one point and pointing what looked like a rifle in the direction of the intersection. Isn't that right? The testimony from—no, that is correct, but it's not— That's Officer Jentz's testimony, right? Yes, much earlier, at the beginning of the sequence. The very first report was he had seen that, right? And that's a critical information— Is that a yes? Yes. One thing that, going through the depositions, that struck me was that the officers who were inside the tank, or the armored vehicle, had different versions of what had happened earlier, and they didn't seem to know—they claimed not to know who he was or know that he was actually the property owner. They also thought that he had fired shots at the original officer, which he had not, right? He had never actually fired shots at the officer. That's right. Or even pointed a gun at the officer. That's correct. But they had erroneous information, or they said they did. So the question is, if there was—if they— how does that factor into the legal analysis? If they thought X, but it was actually Y, but let's say they reasonably thought X because nobody told them otherwise, even though other people knew it, then what? How does that factor into the qualified immunity? If they didn't really—if they didn't know that he was the property owner, for example, because a couple of them said, well, if he was the property owner, we just would have said, well, fine, come out of your truck, and that would have been fine, but we didn't know he was the property owner. But other people did know he was the property owner. So what do we do with that in a qualified immunity analysis? Well, Lottman and Bowman are the supervisors, and they had all of the information, and they were also calling the shots from the command center. So Lottman and who was the other one? Lottman and Sergeant Bowman were the supervisors in control. They were the ones directing, and they were the moving force behind also the constitutional violations. And they're not the people who said in their deposition that they didn't realize who this was or they didn't realize that he hadn't actually tried to shoot anybody or any— No, they both knew who it was. It was known that it was Mr. Sabe. It was known that it was his property. Sergeant Brown and Officer Edwards also knew that it was Mr. Sabe on his property, and they didn't take the time that they needed to to investigate what was going on, and there was credibility issues. But that gets back to my earlier question about whether or not there was sufficient time to formulate the kind of a plan that you hoped they would come up with that would have involved first an attempt to make communication with him either by a loud hailer, or I guess he didn't have a cell phone because he'd thrown it the night before and broke it, according to his wife, so they couldn't call him on the cell phone. That's right. But the problem, as I read the record, was he precipitated the events by moving in the vehicle before they were totally staged and ready to make contact. Well, if your question is did they have the opportunity to make contact, I believe that they did. When? How? Yeah, how? They're loudspeakers. So the B.E.A.R. has a loudspeaker, but the V-150 doesn't, I believe. Is that right? Yes. Okay. And so did both armored vehicles enter at the same time? It's not clear when the B.E.A.R. entered. It's not clear when the B.E.A.R. entered. Because the B.E.A.R. got stuck, and I'm trying to figure out how far away it is and whether they could have communicated with him using its P.A. system. Do we know that? It's not clear how far away the B.E.A.R. was, but it was on the property. Counsel, this is a yes or no. Do we know from this record whether communication was possible from the B.E.A.R.? No, we don't know exactly if it was possible from the B.E.A.R., but they did not try to communicate with him, and that's what we're saying they needed to do. But this was an 88-acre piece of property, right? And it's oddly shaped because it's in pieces that kind of look like the state of California. Yes. Yes. So we don't know if the loudhaler from the B.E.A.R., wherever it was, was close enough to But again, that first requires you've got to know where he is, and until 1527 they didn't know. They thought he might be in the woods, which is a different problem, in which case we have to think about tracking dogs and making officers take risks in entering woods with an armed suspect. Well, we do believe that they could have tried to communicate with him, and Officer Brown, who shot the 14 rounds at him, said that he could have communicated with him. If he hadn't pointed a rifle at him and fired first, according to Officer Brown's testimony. That's what he says, but that fact is in dispute, and his credibility is at issue too. Officer Brown said that he saw that there was flashing lights on the tank and that Mr. Sabi would have seen them. Actually, so does Edwards and Braun. Those lights were activated before he rammed the V-150. That's what they're saying, but that's not true. Counsel, I can see the video, and he rammed the V-150. That's what the video shows. Well, I believe that there is a question of fact that a jury might see that actually the vehicle intended to block Sabi, and they intended to hit him, and they could have turned away, but they didn't. As could he. Counsel, you're significantly over your time. Okay. So we're going to ask to hear from opposing counsel. Now, when you come back, we'll put two minutes on the clock for you. Thank you. Sure. Counsel? Thank you. Good morning, Your Honors. May it please the Court, Scott Davenport for the appellees. In our motion for summary judgment, we presented uncontroverted evidence that a drunken and belligerent man armed with a high-powered AR-15. I'm having trouble hearing you. You're somewhat garbled. Sorry. How are we now, Your Honor? I think that's a little better. Just try to keep your voice up, please. I will try to keep it up. After this extended standoff, Sabi attempted to leave his property. Why was there a standoff when he wasn't seen, he wasn't communicated with, nobody asked him to do anything? What made it a standoff? Well, we had a man who was armed with a rifle. There had been shots fired in the uncontroverted facts. It was on the property where he had, as I understand it, a right to be with his rifle and to fire shots. And if it's an extended period of time, it seems to me that cuts against your client. But I do think the point's well taken, that for some significant period of time here, they didn't know where he was, they'd lost track of him. And then they see him move in the truck, as we've just discussed in significant detail, right? And as I read the CAD, they see him move in the truck, so now they've found him. We're all the way up to 27 minutes after the hour, right? And then I think the armored vehicles enter the field before the truck actually moved. Do I have that sequence wrong? That is not my take on the evidence here. If you look at excerpts of Record 521... Isn't there at least conflicting evidence on that point? You know, Your Honor, I would defer to the CAD, but let me say this. To the extent that there is a dispute... Yes or no, first. Is there conflicting evidence on the point of whether they came on the property before the truck started to move? I don't believe there is, no. Okay, I think there is. So would you take that as a hypothetical? Because I'm really struggling with this. I get that we're down to just a few minutes, and at this point, it's not an extended standoff at all. I mean, at this point, they've located him, and there is this, as we indicated, this prior indication that he's got a gun and that he's intoxicated, and that's very serious. He's next to a roadway. But I'm trying to figure out what bothers me, and I'll just tell you I am very concerned about what was the plan to communicate with this person. And I just don't see it. They haven't told him to do anything or not do anything, and this armored vehicle is bashing into his truck. I think the point at that point, Your Honor, is that they wanted to maintain containment. There was a local school that was in lockdown. So if that point is here, that's what matters. That's why it matters to me the truck hasn't moved yet. In my hypothetical, and I appreciate that you think this is contested, but my hypothetical is the truck hasn't moved. He's moved in the truck, so they found him. If the truck hasn't moved and we want to contain him, then this situation really is the same as it's been for the last hour-plus. And there's no effort to communicate with him that I can see. I really look to see. I'm familiar with the B.E.A.R. vehicle. I know that it's got P.A. capabilities. Is there any place where it tells us they at least tried to use it to communicate? I know it got stuck in the mud, but were they doing anything to try to talk to this person? My understanding is no, and in fact, there was loud noise with a helicopter. They're trying to clear the helicopter out of there so they can communicate. It is a large extended piece of 84 acres. It's a huge piece of land. My understanding is... I can barely hear what you're saying. I'm sorry, but it's very difficult. That's all right. My understanding is it just wasn't practical to be able to communicate with them, especially at a time when they didn't care. They said that they were going on the property to communicate with him. At least some of them said that, but they had no means to communicate with him. They went to the property to get him to come out of the truck and so on, but they had no means to communicate with him. My read on this, Your Honor, is that their number one goal was to keep him from leaving the property, endangering other civilians, including a school that was nearby and on lockdown. Well, that's not correct, according to the CAD. The deposition testimony in the CADs clearly say that initially, the goal was to communicate with them, and then when the defendant's view is that he rammed their vehicle, and then the goal changed. They say that clearly. I don't know that I would agree with that assessment, Your Honor, but... That's what they said. They specifically said that. I think to the extent that there is a dispute on this issue, that's what goes into the qualified immunity analysis. It's not something that should be, that needs to be remanded for a resolution by the trier of fact. I think whether, you know, there's a question that he was moving within the vehicle and the vehicle hadn't started to move yet. He was preparing to move. He'd actually started to move. That's all within that qualified immunity aspect of them trying to prevent this thing from escalating any further. You know, I don't know what the need would have been to enter that property earlier, preemptively, when we were at a status quo and he was sitting there. That's the point. That's the point, counsel. That's the point. I don't either, and that's what I'm struggling with because my hypothetical, again, is that they entered before the truck moved. So they really were at status quo, except now they've located him. That's what I'm struggling with. I want to just give you absolutely, you know, the fairest opportunity to respond to that point. And I appreciate it's granular and I'm not supposed to be doing 20-20 hindsight, but it is very unique for us to have this level of forced use where there's no communication with this person. So could you speak to this, please? Well, again, the testimony, the testimony at the time of the hearing was that they didn't have the ability to have a communication. They just didn't. At an earlier juncture, his brother was there and offered to come talk to him. They didn't let him do that. That's correct. And the purpose of the pit maneuver was to disable the vehicle, not to hurt him, of course, but to stop the vehicle. And yet his wife, April, had said there was another system by which the vehicle could have been disarmed. But I don't see any other mention of it, so I don't know how long that would take or whether that was tried. Should I assume that that was not feasible? It was not tried. It was not tried. Also, they all insisted that he rammed their vehicle, but if you look at the video, he cut left. And they had hit. He was going towards them, it appears, but he didn't hit them. They hit him. Well, I don't know that I would agree with that assessment, Your Honor, but I do know that there was a collision between the two vehicles. His vehicle was directed at the law enforcement vehicle. I think it's... Usually when you say somebody rammed it, that means he ran into them. He didn't. Were both vehicles moving at that point? They were both moving. It looked more like a game of chicken to me. It looked like they were both... I don't mean, again, to be flip, but they were, I think, both moving. He tried to avoid it and didn't succeed. They were both moving toward each other. I don't know that I would agree with the court's characterization of that. Okay. Could you go to the... Fast forward, please. It's just a minute or two in the sequence. Please, sir. And after the pit maneuver was tried and he was spun around, the truck was spun around, the door opened. And it looks from the video pretty clearly as though Mr. Sabe tried to get started to try to get out. What about... And then the vehicle hit his truck again. What about that use of force? Once he's trying to get out, was it fair game to hit the truck again? What do you think about this? Yeah, it was at that point because at that point, like I said, they're concerned about him having a weapon. They're concerned about him attempting to leave. They needed to make sure that that vehicle was disabled. But at other points, if Sabe had just come out of the truck and talked to them, then that would have been okay. So they wanted him to come out of the truck, and then when he tried to get out of the truck, they thought he was dangerous. It's difficult because there is a statement in the record that once he rammed, the defendant's view is that he rammed their armored vehicle, and then the objective changed to, I think, apprehension. They want to arrest him. And so the armored vehicle, the V-150, as I said, hits the truck, spins it around in this pit maneuver. So when the door opens, if they want to... At that point, I'm trying to figure out why additional force was reasonable, sir, because they want to apprehend him and he's getting out of the truck. Could you speak to me and explain what is your best argument that the additional hit, you know, the additional hit by the armored vehicle was reasonable force? I think under the totality of the circumstances, given that we knew he was armed with a weapon, we were concerned about this thing escalating, them wanting to pin him in, in a way that he couldn't get out and be a danger to law enforcement officers or anyone else. Under the totality of the circumstances, that's where we were. And again, now we're talking about... For a while there, we were talking about 90 minutes, then we're talking about three minutes. Now we're talking about a period of about four seconds. And so to second-guess the officers at that point, in the heat of the moment, I just don't think that that's an appropriate analysis. Go a little further. So then one of the officers comes brown, comes out of the turret at that point. I forget which one it was, but there were two people who shot at him. One said that he saw him pointing a rifle at him, and that's why he shot. There's evidence that there were tinted windows. He doesn't say how he saw him. He says he saw him. He doesn't say that he shot. The other one says that he came up through the turret and what? That Sabi was pointing the gun or was shooting the gun at that point? That he returned fire. That he was... I'm sorry? The testimony from the officer was that he returned fire, that Sabi shot first. And the district court found that there was conflicting evidence as to who shot first. Well, I think what the district court said is that the testimony of the officers was that Sabi shot first. The video was somewhat ambiguous. But it wasn't the testimony of, I think, Brown, who says he shot because he saw him pointing the gun, not because he saw him shooting the gun. He said he didn't see him shooting the gun. Is that right? I thought there was testimony from three officers inside the B-150, Corporal Braun, B-R-A-U-N, who was driving Deputy Brown. And who's the other one who shot? Coleman, who fired one round from the side. One who fired one round. Yeah, that all three of them testified that they heard a shot before they opened fire. No. That's how I read their deposition. Whether they heard the shot or not, isn't there uncontroverted testimony that the officers thought they saw him pointing a gun in their direction? They don't have to wait for him to shoot first. That's absolutely correct. So then I think the opposing counsel's response is to question whether that could have been seen because of the tinted windows. But it does seem to me to be – I wasn't sure. Maybe I should ask this. I'm not sure why there was as much focus there was as there was on who shot first. Well, I think that – look, I've watched that video probably as many times as the court has. I think that had he shot first, then we're done. We're done with this analysis. Whether or not he shot first, we're still done because of the qualified immunity analysis. But it makes it a much cleaner case if you see the glass explode outward and there's no question. It is a very tragic case, sir. It's a tragic case, and it's a case that really screams out at, really, if this were 20-20 hindsight, I'm sure a lot of things could be done differently. I don't mean to suggest that any of us think that 20-20 hindsight is the correct standard, but it is a very tragic case. Well, and I think what's very obvious here is there's five lawyers, very smart people sitting around talking about what should have been done. We've been doing it for the last 40 minutes. We don't have a definitive answer, and the officer had just a matter of a couple of minutes, and in fact a couple of seconds, when it came time for the second hit in the middle. Okay, so let's back up, if you could, just humor me. Back to the last 27 minutes after the hour they located him in the truck. We do have clearly established law that before deadly force is used, a warning must be given if practicable. That's the law in the Ninth Circuit. So then we spent a lot of time figuring out what's practicable, and in this case there's a dispute about whether this vehicle, using it in a pit maneuver, was deadly force. Given our definition of deadly force, which is capable of causing death or serious bodily injury, I'm going to ask, and I recognize this is contested, but I'm going to ask you to assume that in my hypothetical, the use of this armored vehicle in this way constituted deadly force. Why wasn't it practicable to give warning before taking the armored vehicle into the field if the truck hadn't moved yet? I don't think we have any evidence of that one way or the other, Your Honor, about what the abilities were at the scene, what they could and could not do. And again, this was an evolving situation, and they had to do what they could to protect the community and their fellow law enforcement officers. We've taken a lot of your time. Did you want to make any final point? No, no. My biggest concern or oral argument is always addressing your concerns, so no, we would submit. Did I hijack your question? Do you have an additional question? No, but I do observe that on page ER382, it's Captain Edwards who says that I leaned out the window to see what I could see. I observed Mr. Sabi maneuvering his rifle to point out the passenger to the side of the car. I brought my arms out, and I believed Mr. Sabi could be a lethal threat at the time since he was trying to point his rifle at us, so I raised my rifle and fired a rap. That's what he said. Judge Talmadge, any additional? Nothing else. Thank you for your argument, counsel. Thank you, Your Honor. And you have two minutes. Thank you, Your Honor. You bet. Your Honor, we believe the district court erred when she didn't consider the factors involving exigency on the unlawful entry and that all of the constitutional violations on the excessive force flowed from that. The district court found and assumed that Mr. Sabi had seen law enforcement officers, and we believe there were facts in dispute that are contrary to that finding, including that there were no lights on the V-150, and that's clear from the video that the lights weren't on. I also believe that the officers, and there's testimony in dispute, that the officers inside of the tank were safe, and they were safe not just from gunfire. I think that for the V-150, the bear is actually the more bulletproof of the two vehicles, right? The V-150 repels most bullets is what I see in the record. I just want to be sure, am I missing anything on that? Yes, you are missing that the V-150 repels rifle fire, and Officer Bowman said that in his deposition. Up to .30 caliber, but as I understand it, this is a Vietnam-era military vehicle, and we know that ballistics capabilities deteriorate over time. Also, the officers didn't know what gun he had. They didn't know what he was firing, so for me this gets back to the point that, and I just want to give you a fair opportunity to respond, it seems to me that the men in the V-150 really couldn't have known that it was bulletproof in the way your brief represents. Could you respond to that? What am I missing there? I did depose the .30B6 expert Schweigert, and he did testify that there was no known deterioration. Sergeant Bowman thought the tank did protect the officers from rifle fire, and also that he believed that they were, Officer Braun testified in his deposition, too, that they took the V-150 out because they were safe inside of it to communicate with someone that had a rifle. Well, Counsel, I don't think that's accurate. He testified that there were chinks in the armor, that there were portions of the V-150 that were more protective than others. It's the testimony where he talks about the creases in the vehicle. Yeah. I'm sorry, Schweigert, are you talking about? No, no, Braun, B-R-A-U-N, the driver. The men in the V-150. The people inside. What is the support for your statement that the people inside the V-150 should have known that they were safe? The fact that they were in a rifle-proof vehicle. Rifle-proof. It was proof that was. . . What if they had been hit with a .50 caliber machine gun or .50 caliber rifle? That armor is not rated for anything over .30 caliber, and as Judge Christen pointed out, they didn't know what caliber rifle he had. And I think that's true, that they didn't know what caliber of rifle, but it was rifle fire that is the testimony. But your position is that they should have believed they were completely safe from harm as long as they were inside the vehicle. I believe that there's at least a disputed fact that they were safe from harm inside of the vehicle, and also they could have retreated, they could have waited until they were more ready to try to communicate with Mr. Sabe, retreated and let him get through the driveway and onto the public roadway. I think it's important in looking at those factors that he wasn't necessarily in the commission of any crime, and that's a disputed fact as well. He'd already committed at least four others by the testimony of the deputies. The unlawful discharge of the firearm, the assault in pointing the weapon at the traffic on the roadway. I believe, Your Honor, there's a disputed fact that the barrel might have been pointing, but he never said there was a shooting stance. He never said that his gun was on the trigger. What he said was he had two arms out and that Mr. Sabe had something in his hands horizontally waist-width. There's a disputed fact that that could have been a surrender. But there are reports that they heard shots fired and believed that they came from the area where he was. This is going back to Officer Jentz's initial testimony. Officer Jentz testified that he heard shots fired, and he didn't know where they were coming from. The district court erred when she said that he said that they were coming from the Sabe property. I read his testimony, and he attributed it to the area where Mr. Sabe was at the time when he heard the shot. That's what Jentz said. I believe what he said was he heard shot unsure where, not from Sabe or his property, Jentz at 272, Your Honor, and that he never saw Mr. Sabe discharge a weapon. And that's important because Jentz himself testified in his deposition that had Mr. Sabe just come out, he would have just walked away. And that's a disputed fact that there was not just not probable cause, there might not have even been reasonable suspicion. During that first encounter, he displayed a firearm, did he not? Officer Jentz said that it looked like it might be a rifle. That's exactly what he said, it might be a rifle, and he wasn't sure. They can be wrong, they just can't be unreasonable. That's what we're struggling with. They can be wrong. But still act reasonably. Did that officer know at that point that it was his property? No, not yet. Officer Jentz did not. There's nothing that he did not know it was his property, Your Honor. Just to go back to the last periods, as to whether they knew where he was, at several minutes, I guess four minutes earlier, at 1523, the cad, is that what we'd call this? It says, human inside crash truck. Red sweatshirt, hasn't moved. So at that point, they did know somebody was in the truck. Yes. Before they went on the property. I'm sorry, Your Honor. Before, so it was when he moved in the truck that they went on the property, but they knew somebody was in the truck. They did know by, I believe it was 23, that they believed he was in the truck, so that they did have more time on that issue to respond to it. But again, we believe that there are facts in dispute. The fact that they went onto the property in a high alert and armed made a very dangerous situation where the constitutional violations flowed from. One other question is, the district judge and your brief seemed to have two excessive force analyses, one having to do with the grabbing by the vehicle and the other having to do with the shooting. And I had a hard time with that because I don't know that anybody was injured by the ramming by the vehicle. So how does that fit in? I think it fits in because that's true that there's no evidence that Mr. Sabhi was injured by the ramming, but it is a constitutional violation to ram, and I believe there are facts in dispute that that would have been deadly force had Mr. Sabhi gotten out. He would have been crushed. He would have been crushed because nothing happened to him. I'm sorry, Your Honor. Would have been, but nothing happened to him. We don't have records showing that he was killed or that there was serious vital injury as a result of the pit maneuvers. That's correct, but it is a constitutional violation to ram by force and seize a vehicle without there being a predicate to support doing that in exigent circumstances to require you to ram it. So if we find that there were exigent circumstances, then were the officers entitled to try and prevent him from leaving the property? I believe that that's a question of fact, at least, on exigent circumstances at that point in time. Assume for the sake of my hypothetical. But at the time they went on the property, there was no shooting going on. There was no—I mean, they either knew he was moving in the truck or there may be some evidence that the truck was moving, but they had no evidence that there was any violence going on at the time they went on the property. That's correct, that there was no evidence. There was nothing— And the only evidence they have was an hour and a half earlier, and it wasn't—it was fairly indistinct. And Mr. Sabhi—there was no evidence to— Counsel, you're way over your time at this point. So could you please wrap up? Yes. We believe that there were numerous facts in dispute and that it was clearly established that Mr. Sabhi had a right to be free from excessive force, that the actions of the officers caused him harm that was approximately caused his death by their entry unlawfully onto his property in a very high alert and armed way. And we believe that as he was in a slow-moving vehicle on his own property that they could have retreated or stepped aside, like the case law in Acosta and the case law in Adams v. Spears, where they did not have to be in harm's way, but instead they were engaging him without any right to do so. Or at least there are facts in dispute that the district court erred in not resolving those facts in favor of Mr. Sabhi, Your Honors. And we ask that you reverse the district court. Thank you. Thank you both for your arguments. They're very, very helpful. And, again, a very tragic case. We appreciate your help with it. Thank you. Could we take a break? Yes. We're going to take a break. We'll be off record for 10 minutes prior to the next argument. Please rise.
judges: BERZON, TALLMAN, CHRISTEN